Watson v. Wilkinson, No. 140-4-10 Bncv (Wesley, J., Feb. 13, 2014).

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

| | |
|---|---|
| SUPERIOR COURT | CIVIL DIVISION |
| Bennington Unit | Docket No. 140-4-10 Bncv |

| | |
|---|---|
| Gerald Watson,<br>        Plaintiff<br><br>        v.<br><br>John Wilkinson,<br>        Defendant | FINDINGS, CONCLUSIONS, AND JUDGMENT |

This claim for trespass to Plaintiff's property, and resulting damage to his pond, was tried to the Court on Nov. 6 & 8, 2013, and Jan. 15, 2014. Plaintiff was represented by Karl Anderson, Esq. Defendant was represented by Jason Morrissey, Esq.

By pre-trial order issued Aug. 21, 2013, the parties were to file proposed findings of fact, together with a memorandum of law, no later than 7 business days prior to the scheduled commencement of the trial on Nov. 6. While Defendant complied with this requirement, Plaintiff did not. At the conclusion of the evidence on Jan. 15, 2014, the Court allowed 15 days for the filing of post-trial supplemental requests for findings of fact, and any further memoranda of law comporting with the evidence. Defendant submitted additional proposed findings and conclusions on Jan. 30, 2014. Plaintiff has never submitted any written summation of the evidence and law in support of his complaint.

**Findings of Fact**

1.      Plaintiff, Gerald Watson, lives at 159 Austin Hill, Bennington, VT. There is a pond approximately 1 acre in size on the property.
2.      The pond was constructed in the late 1960s. Watson has used the pond for swimming and boating continuously, and it has been regularly stocked with trout.
3.      The pond is approximately 14 feet deep, dug in clay soil and unlined. It is fed primarily from three springs at its bottom.
4       The land slopes gradually uphill to the east of the pond. The terrain to the east is a wetland. Surface water flows out of the wetland in multiple small watercourses toward the pond.
5.       When constructed, the pond included a built-up berm to the east, and a dug channel designed to deflect surface water is a southwesterly direction around the pond, toward the outflow stream on the western side of the pond.
6.      The outflow stream is also fed by an overflow pipe set in the pond wall 15 feet above the base of the pond. The outflow stream crosses Watson's property for about 100 feet and into a culvert under Austin Hill road.
7.      Watson has never done any maintenance on the pond. He never noticed any unusual turbidity or evidence of siltation until late spring 2009.

8. At that time, due to having witnessed water flowing east to west over the bank of the pond, which seemed to him to be unusually muddy, Watson came to believe that construction activity by his neighbor to the east, Defendant John Wilkinson, was causing undue erosion and siltation to his pond.

9. Wilkinson resides at 951 Vail Road, Bennington, VT. There are two ponds on Wilkinson's property, a small firepond and a larger pond constructed afterwards and completed in the early 1990s.

10. Wilkinson's property is east of Watson's property, and uphill from Watson's pond. The distance between the larger of Wilkinson's ponds and Watson's pond is approximately 600 feet.

11. The slope between the two ponds is very gradual, rising approximately 25 feet from west to east.

12. The terrain between the two ponds is mature and well-established wetland. There are no defined streams that run through the wetland.

13. The two ponds, and the wetland between them, are part of a larger watershed comprising approximately 96 acres. The watershed has a high point to the east of Wilkinson's property, and drains many streams and springs. The drainage through the watershed is generally east to west across Wilkinson's property, and downhill toward Watson's.

14. In the spring of 2009, Wilkinson undertook construction activities to the west of his larger pond. He used a bulldozer to clear brush, pull stumps, and level the ground for the purpose of establishing a wider lawn.

15. The cleared area, which is now established lawn, was approximately 4 acres, extending approximately 40 feet from the west side of the pond. The area was not part of the wetland, and has remained consistently dry and well drained.

16. Wilkinson credibly denies that he entered the wetlands between his pond and Watson's while using heavy equipment in 2009 to widen the lawn to the west of his pond.

17. Wilkinson credibly denies during the period of his ownership of the property east of Watson's having ever used heavy equipment, or engaged in any construction activities, within the wetlands. There is no evidence contradicting Wilkinson's testimony to such effect.

18. In late summer 2010, when Wilkinson's pond had become largely empty due to a dry summer, he used excavation equipment to repair a leak in the wall of his pond. Wilkinson is uncertain when the leak first occurred.

19. Wilkinson's pond has an outflow to the northeast, which is typically a slight trickle. The outflow continues from the base of the dam around the base of the pond, and into the wetlands to the west between the Wilkinson pond and the Watson pond.

20. The outflow has never caused a well-defined, continuously flowing channel. The outflow from the leak in the west wall of the pond joined the outflow from the dam, not adding significantly to its rate or volume

21. At some point in 2009, at Watson's request, his close friend Peter Percey, walked between the Watson pond and the Wilkinson pond in an effort to assess Watson's concern that his pond was being damaged by undue accumulation of silt. Based on his own lengthy history of visits to the pond, Percey concurred in Watson's observations.

22. Percey claims to have followed a discrete channel, as wide as 28-20 inches wide and deep enough to support a continuously flowing stream, between Wilkinson's pond and Watson's pond.

23. Percey claims to have come to a location near Watson's pond where the flow had eroded the berm and emptied into the pond, because the channel running at the foot of the berm toward the pond's outflow had become silted in.

2

24.     Percey took certain photographs, however he was often unable to distinguish between which he took and which may have been taken by others.  Certain photographs were identified initially has having been taken in 2009, but later proved to have been taken in 2010.

25.     Percey stated that he had taken other photographs documenting the continuously running stream between the two ponds, although he noted these were not among those offered in evidence.

26.     There was no photograph showing the breach of the berm, or the siltation of the channel.

27.     Percey has no expert qualifications with respect to hydrology or the functioning of wetlands.

28.     On a different day in the spring of 2009, Watson made a similar assessment to the one undertaken by Percey, also stating that he followed a distinct watercourse between the two ponds.

29.     Watson did not make a photographic record of that investigation.

30.     On July 29, 2009, Watson complained to the Vermont Agency of Natural Resources regarding Wilkinson's activities.

31.     Investigator Patrick Lowkes from ANR met with Watson at his pond on July 31.  There was heavy rain at the time of the visit, but Lowkes noted no "muddy discharge" to the pond from upstream.

32.     ANR continued its investigation on June 28, 2010 when State Wetlands Biologist Alan Quackenbush met with Wilkinson while making a site visit to examine his pond.

33.     Quackenbush concluded that Wilkinson's pond was not situated in a wetland, and that the construction activities from the previous summer had violated no ANR regulations.

34.     Per Quackenbush's observations, the wetland between the two ponds was well-established with wetland vegetation, including thick cattails and trees.  Further, the wetlands was performing adequately in filtering water moving through the area and not providing a discrete channel for water to scour sediment.

35.     Quackenbush's conclusion, which is fully supported by the evidence here, was "that the complainant's pond had most likely received nutrients over the years due to normal storm events/receiving of sediment load from upstream sources, and not due to work being done by respondent in excess of 1500 feet upstream".

36.     On cross-examination, Quackenbush was asked to comment on photographs purporting to show muddy discharge flows into Watson's pond.  He was unable to confirm the representation that they showed muddy discharges, based only on examination of the photographs.  He acknowledged that, if so, it would be at odds with his observations.

37.     Photographs in evidence, attested by Watson as showing several different events during which muddy discharge flows have emptied into his pond, are of extremely poor quality.  Further, little effort was made to carefully correlate the times of such photographs with proximity to significant rain, snow, or melt runoff events.  The Court accords little significance to such photographs, or to the testimony associated with them.

38.     After being contacted by Watson in May 2010, Noel Dyke assessed his pond for the purpose of recommending any needed repair, and submitted an estimate in June.

39.     Dyke noted a number of inlet streams to the pond.  Although uncertain during his testimony as to the exact number, Dyke recalled that inlet to the pond was not in a solitary channel.

40.     Dyke found the pond in generally "good shape", but requiring some rehabilitation to address silt buildup.

3

41.    Dyke identified a more distinct channel uphill from the pond, which was blocked and creating diffuse drainage toward the pond.  He did not follow the watercourse uphill.

42.    Dyke recommended draining the pond by pumping.  Silt would be removed from the pond with excavation equipment. After being stored on site to dry for a year, the silt would be transported off site.  Dyke's proposal for rehabilitating the pond was estimated to cost $79,216.

43.    Dyke acknowledged that some maintenance is typically required over time to prevent silt buildup with respect to any pond that is exposed to some surface water inflow, or the decomposition of organic matter falling into the pond.

44.    Watson did not engage Dyke as a litigation expert to offer opinions as to the cause of the silt accumulation, and Dyke made it clear in his testimony that he was unprepared and unqualified to do so.

45.    On August 8, 2013, Wilkinson's expert, Errol Briggs, made a site visit to investigate conditions between the Wilkinson and Watson ponds.  By extensive educational background, and professional experience, Briggs is competent to offer expert opinions as to the functioning of wetlands.  The Court adopts as well-supported by the evidence the findings and conclusions of Brigg's report of his site visit, admitted in evidence.

46.     Briggs found that, between the two ponds, the outflow stream from the Wilkinson pond flows in a very irregular course, sometimes in multiple channels, sometimes barely perceptible.

47.    Briggs found that the wetland would rank very high for erosion control due to dense vegetation that bind and stabilize soils, protecting them from erosive forces. Further, the wetland has a high capacity to protect surface and groundwater because the dense riparian vegetation can retain or remove sediments and organic matter.

48.    Noting that just prior to his site visit there had been recent heavy rains, Briggs found the flows through the wetlands intermittent but clear, with no turbidity.

49.    Briggs concluded that the stream course between the Wilkinson and Watson ponds is stable and in natural condition, and there is no evidence of sediments having been carried through the densely vegetated wetland.

**Conclusions of Law**

Our law regarding surface water flowing between neighboring properties is well-established.  See, *Canton v Graniteville Fire District No. 4*, 171 Vt. 551, 552 (2000); *Powers v. Judd,* 150 Vt. 290, 292 (1988); *Swanson v. Bishop Farm*, 140 Vt. 606, 610 91982), *citing Scanlon v. Hopkins*, 128 Vt. 626, 631 (1970).  An upstream owner has the right to have surface water pass to lower lands in a natural condition.  The downstream owner must accept such flows. When complaining that flows have been diverted, or increased beyond a pre-existing natural status, the burden is on the downstream owner to demonstrate wrongful alteration in natural flows, and a causal connection to injury to the downstream property. *See, Canton, citing Nicholson v. Doyle*, 125 Vt. 538 (1966).

Plaintiff has not met his burden of proof. Under the circumstances presented by the evidence, his showing was insubstantial in the absence of any expert opinion, lacking proof that Defendant took some action that altered the natural flow of water between the two properties, and lacking proof that any such alteration was the cause of damage to Plaintiff's pond.  Rather, Plaintiff's evidence as to tortious modification of water flow consisted entirely of the observations made by himself and Mr. Percey.  In turn, this evidence included poorly

4

documented instances of muddy discharges into the Watson pond, and similarly poorly documented treks through the wetland during which each witness claims to have followed a distinct water course up to the Wilkinson pond from where it was discharging into the Watson pond.

Even assuming the truth of the accounts of such a stream on the two or three days during which it was observed, the observations prove little. The credible contrary findings by experts from the Agency of Natural Resources, as well as Mr. Briggs, establish that there has been no recent interference with the functioning of the wetland between the two ponds, and that no steadily flowing stream through the wetland is, or has been, in existence. It is therefore likely that the observations made by Watson and Percey were related to either a recent meteorological event resulting in increased flows of surface water, or to exaggeration. Yet, even *had* there been a steady stream flowing through the wetland, Plaintiff has failed to show what action on the part of Defendant would have caused it. In the absence of more robust proof of acts by Defendant likely to have altered the flow through the wetlands, supported by expert opinion demonstrating that such acts would probably have had the effect of either redirecting or increasing such flows, Plaintiff's belief that muddy discharges into his pond were caused by Defendant rests on nothing but supposition.

Within Plaintiff's logic, he enjoyed decades of enjoyment of a pond whose waters he described as "crystal clear", thus there must be some malignant agency that disturbed the status quo – and Defendant's upstream location and recent use of excavation equipment made him the obvious suspect. As explained, however, Plaintiff has not demonstrated sufficient facts to permit the forging of the many necessary links between suspicion and proof by a preponderance of the evidence. As Defendant insists, with significant support from Plaintiff's own expert on the costs of repair, a pond susceptible to surface water infiltration, as well as other sources of organic matter, will experience silt accumulation. Defendant admits to having taken no steps to address the effects of such accumulation for more than 40 years during which his pond has been in existence. The pond is situated in a large watershed, and despite Defendant's disclaimer, it is likely to regularly experience inflows carrying sediment and having erosive capability. The evident failure of the diversion channel to the east of the berm facing the Wilkinson property is most probably explained by the natural workings of the drainage through the wetland, unmitigated by any regular remedial measures. Under all the circumstances presented by the evidence, that is surely a more plausible explanation than Plaintiff's claim that Defendant must have disturbed the natural flow.

## ORDER

**WHEREFORE,** it is hereby **ORDERED** : Judgment is entered for Defendant based on Plaintiff's failure to prove wrongful diversion of water, and to prove any causal relation to the claimed injury.

Electronically signed on February 13, 2014 at 01:59 PM pursuant to V.R.E.F. 7(d).

_____
John P. Wesley
Superior Court Judge